IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

JOSE MANUEL DIAZ RIVERA, et al.,

    Plaintiffs

    v.                          CIVIL NO. 07-1096 (RLA)

BROWNING-FERRIS INDUSTRIES OF
PUERTO RICO, INC., et al.,

    Defendants.

## ORDER GRANTING BFI'S MOTION FOR SUMMARY JUDGMENT

Defendant BROWNING-FERRIS INDUSTRIES OF PUERTO RICO, INC. ("BFI") has moved the Court to enter summary judgment on its behalf in these proceedings and to dismiss plaintiffs' claims. The Court having reviewed the arguments presented by the parties as well as the documents submitted therewith hereby finds that relief as requested by defendant is proper.

### BACKGROUND

This action was instituted by plaintiffs JOSE MANUEL DIAZ RIVERA ("DIAZ"), his wife and their conjugal partnership against BFI and various unknown defendants alleging that DIAZ was terminated from his employment at BFI in violation of the American with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* In his opposition to the summary judgment request, DIAZ purports to have also pled a claim under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq*. Additionally, plaintiffs asserted various causes of action under our

**CIVIL NO. 07-1096 (RLA)**                                          **Page 2**

supplemental jurisdiction as provided for in 28 U.S.C. § 1367. Specifically, DIAZ sought relief under Puerto Rico Law No. 44 of July 2, 1985 ("Law 44"), our local disability discrimination statute. His wife and conjugal partnership, on the other hand, sued for damages based on tort under art. 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 § 5141 (1993).

SUMMARY JUDGMENT STANDARD

Rule 56(c) Fed. R. Civ. P., which sets forth the standard for ruling on summary judgment motions, in pertinent part provides that they shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Sands v. Ridefilm Corp., 212 F.3d 657, 660-61 (1st Cir. 2000); Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999). The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997). A genuine issue exists if there is sufficient evidence supporting the claimed factual disputes to require a trial. Morris v. Gov't Dev. Bank of Puerto Rico, 27 F.3d 746, 748 (1st Cir. 1994); LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), *cert. denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). A fact is material if it might affect the outcome of a lawsuit under the governing law.

Morrissey v. Boston Five Cents Sav. Bank, 54 F. 3d 27, 31 (1st Cir. 1995).

"In ruling on a motion for summary judgment, the court must view 'the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor.'" Poulis-Minott v. Smith, 388 F.3d 354, 361 (1st Cir. 2004) (citing Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995)).

Credibility issues fall outside the scope of summary judgment. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). See also, Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000) ("court should not engage in credibility assessments."); Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 49 (1st Cir. 1999) ("credibility determinations are for the factfinder at trial, not for the court at summary judgment."); Perez-Trujillo v. Volvo Car Corp., 137 F.3d 50, 54 (1st Cir. 1998) (credibility issues not proper on summary judgment); Molina Quintero v. Caribe G.E. Power Breakers, Inc., 234 F.Supp.2d 108, 113 (D.P.R. 2002). "There is no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, and no room for the judge

CIVIL NO. 07-1096 (RLA)                                      **Page 4**

to superimpose his own ideas of probability and likelihood. In fact, only if the record, viewed in this manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." Cruz-Baez v. Negron-Irizarry, 360 F.Supp.2d 326, 332 (D.P.R. 2005) (internal citations, brackets and quotation marks omitted).

In cases where the non-movant party bears the ultimate burden of proof, he must present definite and competent evidence to rebut a motion for summary judgment, Anderson v. Liberty Lobby, Inc., 477 U.S. at 256-257, 106 S.Ct. 2505, 91 L.Ed.2d 202; Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2000); Grant's Dairy v. Comm'r of Maine Dep't of Agric., 232 F.3d 8, 14 (1st Cir. 2000), and cannot rely upon "conclusory allegations, improbable inferences, and unsupported speculation". Lopez-Carrasquillo v. Rubianes, 230 F.3d 409, 412 (1st Cir. 2000); Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994); Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

### THE FACTS

1.  DIAZ commenced working for BFI in April 1998, as a Helper-Driver. During his tenure at BFI, DIAZ was a member of the Union de Tronquistas de Puerto Rico, Local 901 ("Union").

2.  DIAZ was later designated to the position of Roll-Off Driver. His main responsibility in that position was to drive a roll-off truck to provide complete waste removal for the commercial roll-

off customers of the company. Plaintiff performed his duties as a Roll-Off driver throughout Puerto Rico driving on public highways.

3. Pursuant to the Position Description for the Roll-Off Driver position, plaintiff was required to comply with the following prerequisites: (1) have a valid class A or B Commercial Driver's License ("CDL") with air brakes endorsement; (2) meet all qualifications as defined under the Department of Transportation ("DOT") Regulation 49 CFR § 391.41; and (3) meet Allied Waste Driver MVR Qualification Standards. DIAZ had to be physically qualified under the regulations contained in 49 CFR § 391.41 as these requirements were adopted by the Puerto Rico Public Service Commission ("PR-PSC") in its regulations.

4. The DOT regulations at 49 CFR §391.41 provide the following physical qualifications for drivers:

    (a)  A person shall not drive a commercial motor vehicle unless he/she is physically qualified to do so and, except as provided in § 391.67, has on his/her person the original, or a photographic copy, of a medical examiner's certificate that he/she is physically qualified to drive a commercial motor vehicle.

    (b)  A person is physically qualified to drive a commercial motor vehicle if that person –

.  .  .  .

> (3)   Has  no  established  medical  history  or  clinical
> **diagnosis of diabetes mellitus currently requiring**
> **insulin control**[.]
>
>                     . . . .

(emphasis ours)

5. Both  the  DOT  and  the  PR-PSC  require  the  driver  of  a commercial motor vehicle to be medically examined and certified every two years in accordance with the pertinent regulations as physically qualified to operate a commercial motor vehicle. In this regard, 49 CFR § 391.45 reads:

> Except  as  provided  in  § 391.67,  the  following  persons  must  be medically examined and certified in accordance with § 391.43 as physically qualified to operate a commercial motor vehicle:
>
> (a)   Any person who has not been medically examined and certified  as  physically  qualified  to  operate  a commercial motor vehicle;
>
> (b)(1) Any driver who has not been medically examined and certified  as  qualified  to  operate  a  commercial  motor vehicle **during the preceding 24 months**[.]
>
>                     . . . .

(emphasis ours).

6. The Medical Examiner's Certificate requires that the medical examiner certify that he/she has examined the driver in accordance with the Federal Motor Carrier for Safety Regulations and that he/she

finds the person as qualified thereunder. The date on which the examination was made must be included as well as the date on which the medical certificate expires, i.e., after two years. Both the medical examiner and the driver must sign the certificate. Further, the commercial motor vehicle driver must have on his/her person the original or a copy of the medical examiner's certificate. *See* 49 CFR 391.41.

7. On September 20, 1987, the PR-PSC adopted multiple DOT regulatory provisions, including 29 CFR § 391.41, via its "Reglamento de Seguridad en el Transporte" ("Regulation No. 3511").[1]

8. On July 14, 1997, the PR-PSC updated its regulations to bring them up to par with the Federal Safety Regulations and to rename them "Reglamento para la Seguridad en el Transporte" ("Regulation No. 5648").[2] As clearly stated in its Introduction, the new regulations adopted the Federal Motor Carrier Safety Regulations providing Puerto Rico with the proper mechanisms and procedures to promote and achieve utmost safety in commercial transportation while complying with the federal provisions. In pertinent part, § 1.03 explains the purpose of Regulation No. 5648 as follows:

> These Regulations have the purpose of establishing the minimum requisites for the transportation of cargo and passengers within the jurisdictional limits of Puerto Rico

---

[1]   See docket No. 72-3.

[2]   See docket No. 72-4.

CIVIL NO. 07-1096 (RLA)                                              Page 8

and for the drivers and operators of the commercial motor vehicles covered by these Regulations and **incorporate and harmonize the applicable provisions of the Federal Regulations** for transportation for the purpose of promoting and achieving the maximum safety possible in transportation on the public roads of Puerto Rico.

(Emphasis ours).[3]

9. The physical qualifications for drivers appearing at 49 CFR § 391.41 were adopted *ad verbatim* at § 391.41 of Regulation No. 5648 which, in pertinent part reads:

(a)   A person shall not drive a commercial motor vehicle unless he is physically qualified to do so and, except as provided in Section 391.67, and has on his person the original, or a photographic copy, of a certificate of medical examination establishing that he is physically qualified to drive a motor vehicle.

(b)   A person is physically qualified to drive a motor vehicle if that person:

.   .   .   .

(3)   Has no established medical history or **clinical diagnosis of diabetes mellitus currently requiring insulin for its control**[.]

---

[3] Docket No. 74-4 p. 16.

CIVIL NO. 07-1096 (RLA)                                          Page 9

_____

(Emphasis ours).[4]

    10. Regulation No. 5648 at § 390.3(a)[5] provides that it applies
to "commercial motor vehicles" which, according to § 390.5(a)(45),
are defined as:

        Any self-propelled or towed motor vehicle used in public
        roadways for transportation of passengers and property when the
        vehicle:

            (1) Has a gross vehicle weight rating or gross combination
            weight rating, of more than 10,000 pounds[.][6]

    11. The Roll-Off truck falls within the definition of a
commercial motor vehicle of Regulation No. 5648 because its gross
weight rating or gross combination weight rating is more than 10,000
pounds.

    12. Similar to the federal provisions, Regulation No. 5648 at
§ 391.45(b)(1) requires that drivers of commercial motor vehicles be
medically examined and certified every two years. In pertinent part,
the regulation provides:

_____

    [4]  Docket No. 72-4 pp. 20-21.

    [5]  In pertinent part Regulation No. 5648 reads:

        Section 390.3 General Application

        (a)  The provisions of this Regulation are applicable to
             all employers, employees and commercial motor
             vehicles.

        (Translation ours).

    [6]  Docket No. 72-4 p. 18.

**CIVIL NO. 07-1096 (RLA)**                                      **Page 10**

Except as provided in § 391.67, the following persons must be medically examined and certified in accordance with § 391.43 as physically qualified to operate a commercial motor vehicle:

. . . .

(b)(1) Any driver who has not been medically examined and certified as qualified to operate a commercial motor vehicle **during the preceding 24 months.**

(Emphasis ours).[7]

13. As conceded by plaintiff in his deposition[8] he was medically examined every two years since he commenced working at BFI in order to be certified as qualified to operate a commercial motor vehicle.

14. HMC MEDICAL SERVICES ("HMC") is the medical examiner retained by BFI to perform the medical examination of BFI's drivers in order to certify that they are physically qualified to operate a commercial motor vehicle in accordance with the regulations.

15. Plaintiff's medical examination was due on December 11, 2005. His last medical examination had been conducted on December 11, 2003, when the pertinent certificate had been issued attesting that he was qualified to operate a commercial motor vehicle pursuant to the regulations.

16. On December 1, 2005, plaintiff was referred to HMC by DAVID MARQUEZ, BFI's Safety Representative, to be medically examined on

---

[7]  Docket No. 72-4 p. 24.

[8]  Tr. 116-119.

CIVIL NO. 07-1096 (RLA)                                          **Page 11**

that date along with other employees whose medical certificates expired in December 2005. Plaintiff was medically examined on December 1, 2005. As part of the medical examination, DIAZ provided a urine sample and was subjected to visual and hearing tests.

17. Plaintiff's medical examination reflected that his blood sugar levels were too high. This situation prompted DR. ORLANDO VALLEJO of HMC to order plaintiff to visit his primary treating physician to evaluate whether he needed insulin to control this condition.

18. Due to plaintiff's elevated sugar level HMC did not certify plaintiff as qualified to drive a commercial motor vehicle pursuant to the regulations pending his primary treating physician's feedback as to whether or not plaintiff's condition required insulin. HMC notified these events to BFI.

19. Upon receiving the aforementioned information from HMC, MARQUEZ relayed the same to MS. FIGUEROA, BFI's Senior District Safety Representative, who was MARQUEZ's immediate supervisor at the time. MS. FIGUEROA was responsible for administering BFI's occupational health and safety programs for the district of Puerto Rico, which included implementing internal and external policies in this area.

20. MS. FIGUEROA in turn instructed MARQUEZ to advise JOSE GONZALEZ, plaintiff's then immediate supervisor, that HMC had not certified DIAZ and therefore, plaintiff could not perform his Roll-

CIVIL NO. 07-1096 (RLA)                                          Page 12

Off driver functions until certified by HMC as qualified to drive a commercial motor vehicle pursuant to the applicable regulations.

21. MS. FIGUEROA's instructions to MARQUEZ were based on the information provided by HMC and due to the fact that plaintiff's main responsibility as a Roll-Off driver was to drive a commercial motor vehicle on the public roadways of Puerto Rico and HMC had not certified plaintiff as being physically qualified to do so based on his medical examination.

22. DIAZ was thus suspended from work as of December 1, 2005, until HMC certified him as qualified to drive a commercial motor vehicle pursuant to the applicable regulations. JOSE GONZALEZ informed plaintiff of the BFI's decision.

23. On December 2, 2005, DR. FRANCISCO CHICO, plaintiff's treating physician, prescribed DIAZ insulin ("Humalog Mix"). During his deposition DR. CHICO explained that he prescribed insulin because it was the only treatment that could control plaintiff's diabetes which condition could not be controlled by means of oral drugs. According to DR. CHICO's assessment, plaintiff's condition required the use of insulin long before the time DIAZ started such treatment under DR. CHICO's supervision. Based on DR. CHICO's diagnosis, DIAZ had "Insulin Dependent Diabetes Mellitus."

24. On December 6, 2005, HMC certified to BFI that DIAZ was not qualified to drive a commercial motor vehicle pursuant to the

CIVIL NO. 07-1096 (RLA)                                    Page 13

regulations because he suffered from diabetes mellitus which required the use of insulin for its control.

25. Subsequently plaintiff provided BFI with a medical certificate dated December 15, 2005, issued by DR. CHICO from the Nogal Family Practice Center, indicating that his blood sugar levels were controlled and that he was able to resume his duties at BFI.

26. Even though DR. CHICO testified in his deposition that he had increased plaintiff's insulin doses and frequency of injections on DIAZ's subsequent visits to his office on December 5, 2005, and on December 15, 2005, the certificate issued by him on said date did not indicate that plaintiff's blood sugar was controlled by the use of insulin or other medication.

27. MS. FIGUEROA advised plaintiff that DR. CHICO's medical certificate was insufficient. Rather, he could not go back to work at BFI unless certified by HMC as qualified to drive a commercial motor vehicle under the regulations.

28. MS. FIGUEROA then referred plaintiff to HMC for the medical examiner to evaluate the medical certificate issued by the Nogal Family Practice Center.

29. Plaintiff went back to HMC with the December 15, 2005, certificate where DR. VALLEJO informed him that he was disqualified if his condition required the use of insulin. Plaintiff was urged to consult with his primary physician and explore alternate treatment methods other than insulin. If other options were available,

CIVIL NO. 07-1096 (RLA)                                    **Page 14**

plaintiff was instructed to return to the HMC for reevaluation. DR. VALLEJO did not hear from plaintiff again.

31. In the meantime, DIAZ requested his Union representative to speak to BFI's management to have him assigned to another position at BFI so he could continue working.

32. Upon the request of Union members, JULIO DELGADO, former General Manager of BFI at the Cataño facility, agreed to allow plaintiff to work temporarily in the "utility" position.

33. As a result thereof, on Friday, December 23, 2005, plaintiff returned to work in the "utility" position and was assigned to clean and wash trucks.

34. On Tuesday, December 27, 2005, again plaintiff worked a full shift washing trucks.

35. Upon becoming aware that DIAZ had been temporarily assigned to the task of cleaning BFI's trucks in late December 2005, MS. FIGUEROA recommended that he be relieved from these duties because cleaning trucks did not constitute an independent position at BFI but rather it was a task inherent to the "utility" position which also required a DOT driver certification.

36. As a result thereof, DIAZ was relieved from his temporary duties of cleaning trucks and was again suspended from employment at BFI.

37. Therefore, on Wednesday, December 28, 2005, when plaintiff returned to BFI he was not allowed to work. Instead, he was handed a

CIVIL NO. 07-1096 (RLA)                                        **Page 15**

letter dated that same day which indicated that after having reviewed the documents pertaining to his condition he was suspended from employment until further notice.

38. MS. FIGUEROA discussed the matter with JULIO DELGADO and her superiors in the United States, including ROBERT CRAWFORD, Regional Safety Manager for the Southeast Region of Allied Waste, which includes BFI, and recommended that he be terminated from his employment at BFI because he could not perform the duties and responsibilities of his position.

39. CRAWFORD adopted MS. FIGUEROA's recommendation to terminate DIAZ since he had not been medically certified as physically qualified to drive a commercial motor vehicle, an essential part of his duties and plaintiff had failed to present evidence to the contrary despite having been given ample opportunity to do so.

40. On Thursday, December 29, 2005, plaintiff was informed by his supervisor that he was terminated.

41. Via a letter dated December 30, 2005, plaintiff was advised that he was terminated from his BFI Roll-Off driver position effective December 29, 2005, because he did not meet the DOT requirements set forth at 49 C.F.R. § 391.41(b)(3).

42. Up to the time of his termination, plaintiff continued the use of insulin to control his condition as per his treating physician's recommendation. Prior to December 29, 2005, DIAZ never presented any medical evidence to either HMC or any BFI official

CIVIL NO. 07-1096 (RLA)                                    Page 16

certifying that he could control his diabetes without the use of insulin.

43. At the time she recommended that DIAZ be terminated from employment at BFI and CRAWFORD's acceptance of her recommendation, neither MS. FIGUEROA nor CRAWFORD were aware that plaintiff had requested to be assigned to another position at BFI nor that he had requested any kind of accommodation.

**ADA**

**Regarded as Disabled**

"The ADA prohibits discrimination against 'a qualified individual with a disability' - that is, 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires' - 'based on that disability.' 42 U.S.C. §§ 12111(8), 12112(a)." <u>Mulloy v. Acushnet Co.</u>, 460 F.3d 141, 145 (1st Cir. 2006).

In cases of alleged ADA violations, absent direct evidence of discrimination, the "burden-shifting framework outlined by the Supreme Court in *McDonnel Douglas*" is used. <u>Tobin v. Liberty Mut. Ins. Co.</u>, 433 F.3d 100, 104 (1st Cir. 2005).

In order to meet his prima facie burden plaintiff must prove that: (1) he suffers from a "disability" within the meaning of the ADA; (2) he was able to perform the essential functions of his position with or without reasonable accommodation; and (3) the

employer's adverse employment actions were based in whole or in part on his disability. Mulloy, 460 F.3d at 146; Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc., 447 F.3d 105, 111 (1st Cir. 2006); Tobin, 433 F.3d at 104; Bailey v. Georgia-Pacific Corp., 306 F.3d 1162, 1166 (1st Cir. 2002); Carroll v. Xerox Corp., 294 F.3d 231, 238 (1st Cir. 2002); Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 18 (1st Cir. 2002); Quint v. A.E. Staley Mfg. Co., 172 F.3d 1, 9 n.3 (1st Cir. 1999); Tardie v. Rehab. Hosp. of Rhode Island, 168 F.3d 538, 541 (1st Cir. 1999).

As part of the prima facie scheme plaintiff must initially establish that he has a "disability" within the meaning of the statute. "The *sine qua non* requirement for ADA protection, is whether the individual has a 'disability' as defined by the ADA." Castro-Medina v. Procter & Gamble Commercial Co., 565 F.Supp.2d 343, 358 (D.P.R. 2008) (citation, brackets and internal quotation marks omitted). "Not all physical impairments rise to the level of disability under the ADA." Lebron-Torres v. Whitehall Lab., 251 F.3d 236, 239 (1st Cir. 2001). Rather, we are limited by ADA's definitions of what entails a "disability" to determine its scope.

The statute's definition of "disability" includes: "(A) a physical or mental impairment which substantially limits one or more of an individual's major life activities; (B) a record of such impairment; or (C) being **regarded** as having such an impairment." 42 U.S.C. § 12102(2) (emphasis ours). *See also*, 29 C.F.R. 1630(2)(g).

Thus, ADA's protection does not depend exclusively on an individual being actually disabled but rather it also extends to the employer's erroneous perception as to limitations associated to the plaintiff's real or perceived condition.

According to the Supreme Court, "[t]here are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual - it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when in fact, the impairment is not so limiting." Sutton v. United Air Lines, Inc., 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). See also, Murphy v. United Parcel Service, Inc., 527 U.S. 516, 521-22, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999); Bailey, 306 F.3d at 1169; Carroll, 294 F.3d at 238 n.4; Rodriquez-Garcia v. Junta de Directores, 415 F.Supp. 42, 45 (D.P.R. 2006). See also, Ruiz-Rivera v. Pfizer Pharm., LLC, 521 F.3d 76, 83 (1st Cir. 2008); Katz v. City Metal Co., Inc., 87 F.3d 26 (1st Cir. 1996).

"An individual who has an impairment that is not substantially limiting (or has no impairment at all) is nevertheless 'disabled' if

[he] is treated by [his] employer as having an impairment that does substantially limit major life activities." Tardie v. Rehab. Hosp. of Rhode Is., 168 F.3d 538, 541 (1st Cir. 1999).

The purpose behind this provision is to avoid situations where an individual is "rejected from a job because of the 'myths, fears and stereotypes' associated with disabilities". 29 C.F.R. § 1630.2(l) EEOC Interpretative Guidance citing Sch. Bd. of Nassau County v. Arline, 480 U.S. 273, 287, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)). See also, Sutton, 527 U.S. at 489-90; Quiles-Quiles v. Henderson, 439 F.3d 1, 6 (1st Cir. 2006); Calef v. Gillette Co., 322 F.3d 75, 87 n.9 (1st Cir. 2003). "The regarded as prong of the ADA exists to cover those cases in which myths, fears and stereotypes affect the employers' treatment of an individual, because Congress has recognized that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." Ruiz-Rivera, 521 F.3d at 82-83 (1st Cir. 2008) (citations and internal quotation marks omitted).

Plaintiff's burden under this particular ADA modality then is to present evidence of BFI's inaccurate perception as to purported limitations set by his insulin dependent diabetes.[9] That is, BFI's

---

[9]  DIAZ does not argue that he is disabled due to his diabetic condition. Diabetes by itself does not constitute a disability under ADA unless it impairs an individual's ability to work or engage in other major life activities. See, i.e., Scheerer v. Potter, 443 F.3d

erroneous subjective belief regarding plaintiff's perceived impairment based on his condition. However, it is uncontested that at all relevant times plaintiff's disqualification from work was based exclusively on the lack of the medical certification mandated by the PR-PSC which allowed no discretion on the part of BFI to disregard this requirement. Given the regulatory constraints applicable to plaintiff's condition there was no room for BFI's subjective belief regarding any real or imagined ADA based impairment. In other words, plaintiff was not allowed to drive the Roll-Off truck not because of BFI's erroneous belief of physical sequelae resulting from plaintiff's insulin-dependent diabetes, but because the law established that he was not qualified to drive this particular type of vehicle on public roads.

This is confirmed by the fact that at all pertinent times plaintiff was referred to his failure to meet the regulatory qualifications as the reason for BFI's decision.

Plaintiff argues that inasmuch as the DOT regulations are inapposite in Puerto Rico because there is no interstate travel the requirements embodied therein constitute a discretionary employment policy. Hence, he posits that BFI must affirmatively demonstrate, through an individualized assessment, that plaintiff's driving a heavy truck posed a safety hazard contrary to the position of

916, 919 (7th Cir. 2006) ("[D]iabetic status, *per se*, does not qualify a plaintiff as disabled under the ADA.")

plaintiff's treating physician who opined that his diabetes was under control and that his driving this type of vehicle presented no danger to others.

We agree that if the BFI Roll-Off vehicle was only operated intrastate federal standards are not applicable. *See i.e.*, <u>Fortunato v. Cooley Dickinson Hosp., Inc.</u>, 597 F.Supp.2d 206, 209 (D.Mass. 2009). However, we find that the fact that BFI may have relied upon DOT regulations for its determination regarding plaintiff's medical qualification is of no consequence to our decision in this particular case inasmuch as the PR-PSC provisions - which in pertinent part are identical to its federal counterpart - do provide mandatory legal requirements for commercial drivers such as plaintiff herein.

Similar to the employer in *Albertson's*, BFI "was not insisting upon a job qualification merely of its own devising, subject to possible questions about genuine appropriateness and justifiable application to an individual for whom some accommodation may be reasonable. The job qualification it was applying was the distant visual acuity standard of the Federal Motor Carrier Safety Regulations [in this case PR-PSC].... The validity of these regulations is unchallenged, they have the force of law, and they contain no qualifying language about individualized determinations." <u>Albertson's Inc. v. Hallie Kirkingburg</u>, 527 U.S. 555, 570, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999). "When Congress enacted the ADA, it recognized that federal safety rules would limit application of the

**CIVIL NO. 07-1096 (RLA)**                                    **Page 22**

ADA as a matter of law." <u>Harris v. P.A.M. Transp., Inc.</u>, 339 F.3d 635, 639 (8th Cir. 2003).

No safety risk assessment associated with the duties of the Roll-Off driver position need be made in plaintiff's case because there was no discretion on defendant's part to forgo the medical regulatory requirement. The exclusion of an insulin dependent driver was compulsory under the regulations issued by the PR-PSC in effect at the time plaintiff was terminated.

The need for an individualized assessment has been rejected when mandatory safety regulations render an individual unfit for a position even in cases where the statute allows for waivers thereof. *See, i.e.*, <u>Albertson's</u>, 527 U.S. at 558. ("The question posed is whether, under the Americans with Disabilities Act... an employer who requires as a job qualification that an employee meet an otherwise applicable federal safety regulation must justify enforcing the regulation solely because its standard may be waived in an individual case. We answer no.")

The situation before us must be distinguished from those cases where an employer imposes DOT regulatory safety requirements to positions which otherwise fall outside their purview. *See i.e.*, <u>Warren v. United Parcel Serv., Inc.</u>, 518 F.3d 93, 96 (1st Cir. 2008) (UPS had policy requiring DOT card for all package car drivers regardless of size of vehicle they drove).

Further, as previously noted, the "regarded as" ADA approach is based on misconceptions involving real or perceived limitations associated with real or perceived disabilities. This is undisputably not the case before us. BFI's determination did not arise from "myths, fears and stereotypes" concerning plaintiff's medical condition. In other words, BFI did not display an erroneous perception, myth or stereotypical view of plaintiff's insulin-based dependence. Rather, BFI's decision to suspend and eventually terminate plaintiff was based not on a discretionary job prerequisite pertaining to diabetics but on mandatory PR-PSC regulatory requirements. The record is clear that BFI's decision to relieve plaintiff from his duties as a Roll-Off driver was based exclusively upon the undisputed fact that plaintiff was not certified by the medical examiner as physically qualified to drive a commercial motor vehicle on public roads. There is also no controversy over the fact that by December 1, 2005, plaintiff's blood sugar levels were elevated and that these were subsequently controlled by his primary physician only with the use of Humalog Mix, an insulin medication.

DIAZ points to BFI's alleged failure to advise him of the waiver provisions available in the DOT regulations in support of its ADA claim. We find no duty on the part of an employer to either alert an employee of such waivers or reserve his employment while an individual completes the waiver process. *See i.e.*, <u>Albertson's</u> (no

CIVIL NO. 07-1096 (RLA)                                          **Page 24**

ADA violation due to employer's refusal to rehire former employee after he had obtained DOT waiver).

Further, most importantly, the waivers contemplated by the PR-PSC regulations in force at the time of the events at issue in this litigation[10] were specifically limited to two types of disqualifications none of which included insulin-dependent diabetics.[11]

---

[10] The provision regarding exemptions in Regulation No. 5648 reads as follows:

Section 391.49 - Exemption of certain physical defects.

(a) A person who is not physically qualified to drive under Section 941.41(b)(1) or (2) and who is otherwise qualified to drive a motor vehicle may drive a motor vehicle if the Commission, person or office on whom it delegates has granted an exemption.

(Translation ours).

[11] Pursuant to § 391.49, only drivers who fall under the following categories listed at § 391.41 may petition for waivers:

(b)(1) Has not lost a foot, leg, hand, arm, or has been granted an exemption according to Section 391.49.

(b)(2) Has no impairment of:

(I) A hand or finger(s) which can interfere with his power to grasp or hold;

(ii) An arm, foot, or leg which may interfere with the ability to perform normal tasks associated with operating a motor vehicle; or any other defect or limitation which interferes with the ability to perform normal tasks associated with operating a motor vehicle; or has been granted an exemption according to Section 391.49.

CIVIL NO. 07-1096 (RLA)                                          **Page 25**

Based on the foregoing, we find that plaintiff has failed to meet his prima facie burden of establishing that he was "regarded as" disabled within the meaning of ADA. BFI's decision was not based on either an erroneously perceived disability or on a subjective belief as to unfounded substantial limitations on plaintiff's ability to work due to his insulin-dependent diabetes.

Accordingly, the "regarded as" ADA claim is **DISMISSED.**

### Retaliation

Plaintiff also avers that his termination from employment further breached ADA in that it was allegedly prompted by his request for accommodation. Plaintiff's argument in support of this particular claim is based exclusively on the timing between plaintiff's alleged request for accommodation and his termination from employment.

The retaliation claim provided for in ADA suits[12] is independent from the other discriminatory causes of action allowed under the statute. <u>Freadman v. Metro. Prop. and Cas. Ins. Co.</u>, 484 F.3d 91, 106 (1st Cir. 2007). Retaliation for having requested accommodation or

Docket No. 74-2 p. 21.

[12]  ADA provides at 42 U.S.C. § 12203(a):

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

complaining for refusing to accommodate is a separate claim actionable under the ADA and is not contingent on the outcome of a disability claim. Guzman-Rosario v. United Parcel Service, Inc., 397 F.3d 6, 11 (1st Cir. 2005). See also, Feliciano-Hill v. Principi, 439 F.3d 18 (1st Cir. 2006) (retaliation claim may go forward even if disability discrimination action dismissed); Wright v. CompUSA, Inc., 352 F.3d 472, 477 (1st Cir. 2003) ("An ADA plaintiff need not succeed on a disability claim to assert a claim for retaliation.")

"To establish a claim of retaliation, a plaintiff mush show that (1) [he] engaged in protected conduct, (2) [he] suffered an adverse employment action, and (3) there was a causal connection between the protected conduct and the adverse employment action." Freadman, 484 F.3d at 106. See also, Carmona-Rivera v. Commonwealth of P.R., 464 F.3d 14, 18-19 (1st Cir. 2006); Wright, 352 F.3d at 478. The First Circuit Court of Appeals has ruled that "requesting an accommodation is protected activity for purposes of § 12203(a)." Wright, 352 F.3d at 478.

Thus, assuming that the Union's request to assign plaintiff to another position was tantamount to an accommodation petition on his behalf and given the fact that DIAZ was terminated from employment we shall assume, for purposes of this particular cause of action, that plaintiff met the first two requirements for a retaliatory claim.

This cause of action, however, fails at the third prong. Even though "[t]emporal proximity can create an inference of causation in

the proper case... to draw such an inference, there must be proof that the decisionmaker knew of the plaintiff's protected conduct when he or she decided to take the adverse employment action." Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 84 (1st Cir. 2006) (Title VII case).[13] *See also*, Freadman, 484 F.3d at 106 (no causal connection inasmuch as accommodation request made after decision to remove plaintiff made); Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997) (Title VII case) ("[T]he adverse action must have been taken for the *purpose* of retaliating. And to defeat summary judgment, a plaintiff must point to *some* evidence of retaliation by a pertinent decisionmaker.")

The undisputed evidence shows that neither ELVIA FIGUEROA - the person who recommended plaintiff's termination  - nor ROBERT CRAWFORD - the final decisionmaker - were aware of the fact that the Union had allegedly requested plaintiff's reassignment to a different position or accommodation. Thus, plaintiff has failed to establish the necessary causal nexus between the purported protected conduct and the alleged retaliatory dismissal for which reason plaintiff's ADA retaliation claim fails.[14]

---

[13]   "The ADA incorporates the procedures and enforcement mechanisms of Title VII... Accordingly, guidance on the proper analysis of [plaintiff's] ADA retaliation claim is found in Title VII cases." Soileau v. Guilford of Maine, Inc., 105 F.3d 12, 16 (1st cir. 1997).

[14]   Given our ruling, there is no need for us to address the other grounds for dismissal of the ADA claims which were advanced by BFI in its motion for summary judgment.

Accordingly, plaintiff's retaliation claim under ADA is **DISMISSED.**

### FMLA

Defendant has also sought the dismissal of claims purportedly asserted under the FMLA pursuant to Rule 8 Fed. R. Civ. P.

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (internal citation and quotation marks omitted); Bell Atlantic Corp. V. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Educadores Puertorriqueños en Acción v. Rey-Hernández, 367 F.3d 61, 67 (1st Cir. 2004).

"[U]nder Fed. R. Civ. P. 8 it is not necessary that a legal theory be pleaded in the complaint if plaintiff sets forth sufficient factual allegations to state a claim showing that he is entitled to relief under *some* viable legal theory." Fitzgerald v. Codex Corp., 882 F.2d 586, 589 (1st Cir. 1989) (internal citations and quotation marks omitted, italics in original). However, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing

not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." Bell Atlantic, 550 U.S. n.3 at 556.

"The FMLA was enacted to help working men and women balance the conflicting demands of work and personal life. It does so by recognizing that there will be times in a person's life when that person is incapable of performing her duties for medical reasons. The twin purposes of the FMLA are to balance the demands of the workplace with the needs of families and to entitle employees to take reasonable leave for medical reasons." Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 159 (1st Cir. 1998) (internal citations and quotation marks omitted).

Protection under the FMLA comes in two ways. On the one hand the statute provides substantive rights to eligible employees by way of up to twelve weeks of unpaid leave due to any of the following: care for a child upon birth, adoption, or foster care; care for an immediate family member with a "serious health condition" and the employee's inability to work at his job due to "a serious health condition." 29 U.S.C. § 2612(a)(1). Leave may also be taken either "intermittently or on a reduced leave schedule when medically necessary." 29 U.S.C. § 2612(b)(1). Additionally, an employee who avails himself of the FMLA's leave benefit is entitled to be restored to his former or to an equivalent position upon returning to work. 29 U.S.C. § 2614(a)(1).

"These rights are essentially prescriptive, setting substantive floors for conduct by employers, and creating entitlements for employees. As to these rights, therefore, the employee need not show that the employer treated other employees less favorably, and an employer may not defend its interference with the FMLA's substantive rights on the ground that it treats all employees equally poorly without discrimination. In such cases, the employer's subjective intent is not relevant. The issue is simply whether the employer provided its employee the entitlements set forth in the FMLA - for example, a twelve-week leave or reinstatement after taking medical leave. Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employee." Hodgens, 144 F.3d at 159 (internal citations and quotation marks omitted). *See also*, Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 331 (1st Cir. 2005).

The FMLA also has a "proscriptive portion" which protects employees who are subject to discrimination for having made use of the statute's leave benefits. "In addition to creating the above entitlements, the FMLA provides protection in the event an employee is discriminated against for exercising those rights. In particular, an employer is prohibited from discriminating against employees who have used FMLA leave. Nor may employers use the taking of FMLA leave as a negative factor in employment actions, such as hiring,

promotions or disciplinary action." Hodgens, 144 F.3d at 159-60 (internal citations, quotation marks and brackets omitted). *See also*, Colburn, 429 F.3d at 331-33 (discussing actions based on "interference" with FMLA protected rights and for retaliation for having exercised those rights). *See also*, Colburn, 429 F.3d at 330 ("The FMLA contains two distinct types of provisions: those establishing substantive rights and those providing protection for the exercise of those rights" and Castro-Medina v. Procter & Gamble Commercial Co., 565 F.Supp.2d 343, 382 (D.P.R. 2008).

When a cause of action is premised on alleged breach of the proscriptive portion of the FMLA, "the employer's motive is relevant, and the issue is whether the employer took the adverse action because of a prohibited reason or a legitimate nondiscriminatory reason." Hodgens, 144 F.3d at 160. Under these circumstances, similar to Title VII discriminatory suits, the *McDonnel Douglas* burden-shifting framework is used where no direct evidence of discriminatory motive is available. *Id*.

In the case before us, plaintiff argues that "[t]he operative facts alleged in the complaint by themselves include an FMLA claim, although the complaint nowhere mentions the words 'FMLA' nor identifies explicitly a description of a cause of action for FMLA."[15] In support of his position plaintiff specifically makes reference to paragraphs 23, 27, 28 and 32 of the complaint which read:

_____

[15]   Joint Motion.... (docket No. 77 p. 30).

23. As a result of BFI's snooping into Diaz's medical conditions not related to illicit drug use, BFI "security" supervisor, one Mr. Márquez, informed Diaz that he could not return to work until he controlled his sugar levels, suspending Diaz without pay for several weeks, during which period Diaz was denied the benefits and privileges of his employment.

27. Not knowing that he was really not disabled, Diaz asked his Union representatives to intervene on his behalf, and at this request, after Diaz invoked his rights to a reasonable accommodation, the Union representatives, on Diaz behalf, ask (sic) BFI to have Diaz return to his job with a reasonable accommodation.

28. As a result of Diaz's request for a reasonable accommodation, properly invoked under the Americans with Disability (sic) Act, [plaintiff] was placed in the position of "utility" where his job was to clean the trucks.

32. On December 29, 2005, Diaz is (sic) given a second letter, this time discharging Diaz from his employment, because Diaz did not qualify to be a driver under the Federal Department of Transportation Standard 49 C.F.R. § 391.41(b)(3). True and exact copy of the letter is

**CIVIL NO. 07-1096 (RLA)**                                            **Page 33**

attached as exhibit B of this complaint with its corresponding translation.

As previously noted, in order for plaintiff to adequately plead an FMLA claim he must meet a minimum notice requirement by putting defendant in a position to defend itself from the claims. Upon careful review of the aforementioned paragraphs of the complaint - which were pointed out by plaintiff as purportedly supporting his FMLA cause of action - we fail to find any factual assertion that even remotely would give the defendant fair notice of a claim under FMLA either on its prescriptive or proscriptive modality. No indication is given in the complaint as to plaintiff's entitlement to unpaid leave due to a "serious health condition" which was denied by his employer nor to defendant's alleged interference and/or retaliation based on plaintiff having availed himself of the FMLA leave benefits.

Faced with this factual scenario, there is no possible way the court may find plaintiff entitled to any relief under the provisions of the FMLA for which reason BFI's request is **GRANTED** and the FMLA claim is **DISMISSED**.

### SUPPLEMENTAL CLAIMS

Plaintiffs have also asserted local claims for disability discrimination under Law 44 as well as petitioned damages under the Puerto Rico negligence statute.

### Law 44

Inasmuch as Law 44 mirrors ADA, and because we have concluded that plaintiff was not disabled within the meaning of ADA, his Law 44 disability claim also fails. Ruiz-Rivera, 521 F.3d at 87; Garcia-Diaz v. Darex, 148 D.P.R. 364, 385 (1999); Roman Martinez v. Delta Maintenance Serv. Inc., 229 F.Supp.2d 79, 86 (D.P.R. 2002).

Based on the foregoing, plaintiff's Law 44 claim is **DISMISSED**.

### Art. 1802

DIAZ's wife as well as the conjugal partnership constituted between them seek damages purportedly resulting from "BFI's illegal actions" against plaintiff.[16]

In Puerto Rico, relatives of a victim of employment discrimination have available a derivative suit under art. 1802 of the Puerto Rico Civil Code for compensation of any damages flowing from the breach of the statutory provisions. This type of suit, however, is premised on tort principles and not on employment discrimination statutes. Further, it is contingent on the employee prevailing on his or her discrimination claim. Marcano-Rivera v. Pueblo Int'l, Inc., 232 F.3d 245, n.7 at 258 (1st Cir. 2000); Martinez-Campos v. Banco de Ponce, 138 D.P.R. 366 (1995); Santini-Rivera v. Serv Air, Inc., 137 D.P.R. 1 (1994).

The Court having dismissed DIAZ's causes of action for employment discrimination, the art. 1802 derivative claims asserted by his wife

---

[16]   Complaint (docket No. 1) Fifth Cause of Action ¶ 69.

**CIVIL NO. 07-1096 (RLA)**                                    **Page 35**

and their conjugal partnership must suffer the same fate. Accordingly, the art. 1802 suit filed by them is **DISMISSED.**

**CONCLUSION**

Based on the foregoing, BFI's Motion for Summary Judgment (docket No. **64**)[17] is **GRANTED** and the complaint filed in this case is hereby **DISMISSED.**

Judgment shall be entered accordingly.

IT IS SO ORDERED.

San Juan, Puerto Rico, this 16th day of June, 2009.


                                    S/Raymond L. Acosta
                                    RAYMOND L. ACOSTA
                                    United States District Judge

---

[17] See Joint Motion and Memorandum of Law in Opposition (docket No. **77**) and BFI's Reply (docket No. **107**). See also, BFI's Motion Submitting Certified Translations (docket No. **72**).